Jeremy I. Lessem (Bar No. 213406)
Lessem Newstat & Tooson LLP
jeremy@lnlegal.com
3450 Cahuenga Blvd, Unit 102
Los Angeles, CA 90068
Telephone: (818) 582-3087
Fax: (818) 484-3087

*Attorney for Defendant Brett Barber*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>BRETT A. BARBER,<br><br>*Defendant.* | Case No.: CR-21-00196-ODW<br><br>**DEFENSE SENTENCING MEMORANDUM**<br><br>Sentencing Date: June 17, 2024<br>Sentencing Time: 9:00am |

**TO THE HONORABLE OTIS D. WRIGHT, UNITED STATES DISTRICT JUDGE, THE UNITED STATES ATTORNEY'S OFFICE AND ITS ATTORNEY OF RECORD, ASSISTANT UNITED STATES ATTORNEY BRADLEY MARRETT, AND UNITED STATES PROBATION OFFICER ADNAN CHAUDHRY:**

Defendant Brett Barber (hereinafter the "***Defendant***"), by and through counsel of record, Jeremy I. Lessem, hereby files Defendant's Sentencing Memorandum in the above-entitled matter.

1

1

2  Dated: June 3, 2024                    Respectfully submitted,

3
                                          By:     //s// Jeremy I. Lessem
4                                                 JEREMY I. LESSEM
                                                  Attorney for Defendant
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.
# INTRODUCTION

Brett Barber never set out with the intention of stealing or defrauding anyone. In fact, Mr. Barber has spent most of his adult life as a financial planner, advisor, and broker. He has a long track record of providing clients with sound investment advice and returning strong financial returns for his clients. Many of the named victims in this case were former clients and friends of Mr. Barber, who themselves have enjoyed past success because of Mr. Barber's efforts.

When Mr. Barber established the company BNZ, it was for the purpose of investing in real estate and related assets and turning a profit for himself and his investors. And it is not disputed that Mr. Barber did exactly that. At the time of Mr. Barber's arrest, BNZ, and later NAC, both held significant financial assets in the form of real property, secured debt, cash, and other related assets. While the precise value of these assets may be in dispute, Mr. Barber was not simply operating a Ponzi scheme. Rather, he was accepting funds and investing these funds in opportunities he believed had the potential to provide significant returns on that investment.

This does not mean, however, that Mr. Barber did not break the law. While Mr. Barber continues to contest the value of the assets seized by the government and the resulting loss to investors, he acknowledges and accepts that he committed the two offenses for which he has pleaded guilty. While he may have set off with the best of intentions, as the economy slowed down during the covid-19 pandemic, Mr. Barber's investments, along with the rest of the world's economy, began to underperform. When this began to happen, Mr. Barber had a legal and ethical obligation to be up front with his investors. They needed to be informed of the financial difficulties related to their investments, and Mr. Barber potentially needed to default on his payment obligations. Many companies failed during this time. That likely should have been the fate of BNZ. At a minimum, past and potential investors needed to be fully apprised of the financial difficulties BNZ's assets were experiencing.

Instead of being up front and facing this economic reality with his investors, Mr. Barber made a different choice. He decided that if he could obtain additional investment funds from new investors, he could use that money to keep the company afloat, pay its obligations to older investors and keep the enterprise solvent until the markets rebounded. Mr. Barber believed that with a continued infusion of cash from new investors, eventually company assets would appreciate, the company would return to solvency, and everyone would make their promised returns.

In making this choice, Mr. Barber misled investors and paid older investors with the proceeds from new ones. Admittedly, this is wire fraud. A crime for which Mr. Barber pleaded guilty and continues to admit his guilt. These poor decisions were partly fueled by a relapse in Mr. Barber's longstanding struggles with drugs and alcohol, as well as an intense desire on his part to not let these companies fail. However, Mr. Barber was never motivated by a desire to steal from his investors. On the contrary, Mr. Barber himself had most of his personal savings invested in these companies, and intensely wanted them to survive and make money.

While Mr. Barber was wrong when he made the decision to deceive his investors, he wasn't wrong with respect to the eventual profitability of his investments. At the time Mr. Barber was indicted in this case, many of the financial assets related to BNZ and NAC were seized by the government.[1] The seized assets included cash, real property, and other secured investments. Even after Mr. Barber entered into a plea agreement, attorneys and experts in the related civil matter continued to work on identifying all the available assets and liabilities of the subject entities. They also worked on assessing the value of these assets in comparison to the debts owed to all the named victims in this case. This work is ongoing; however, preliminary financial examinations demonstrate that the value of company assets exceeds the amounts currently owed to investors. Attached to this memorandum as Exhibit "A" are spreadsheets documenting this current assessment.

---

[1] In addition to assets already seized by the government, other company assets exist which have yet to be identified by the government. Mr. Barber hopes to work with law enforcement to identify and collect these assets to ensure all victims are compensated in full.

Mr. Barber accepts responsibility for his unlawful conduct. He broke the law and is currently incarcerated because of the poor decisions he has made. However, while Mr. Barber has remained motivated to take responsibility for his actions, he has also consistently proclaimed that ample assets exist to cover all outstanding investor losses. This was the subject of Mr. Barber's motion to withdraw his plea. While Mr. Barber does not seek to have that motion relitigated here, he does ask that this Court fully consider the financial documentation filed concurrently herewith. Additionally, he asks this Court even consider setting an evidentiary hearing on the issue of loss amount to analyze these issues more thoroughly. If the government disagrees with the Defendant's stated value of the outstanding company assets it should be allowed to present these objections. This Court can listen to these differences and make an informed and reasoned judgment. In any event, this Court is not required to blindly accept the loss amount articulated in the plea agreement. An amount which Mr. Barber has consistently and repeatedly proclaimed as inaccurate and outdated.

## II.
## PROCEDURAL BACKGROUND

A. The Plea Agreement

On October 30, 2023, Defendant plead guilty to counts 2, 5 and 12 of a 12 count first superseding indictment. Counts 2 and 5 charge a violation of 18 U.S.C. §§ 1343, 2(a), wire fraud and count 12 charges a violation of 18 U.S.C. § 401(3), criminal contempt. In the plea agreement, the parties agreed to a base offense level of 7, pursuant to U.S.S.G. §2B1.1(a)(2). The parties further agreed to an 18-level increase based on loss amount; a 4-level increase for substantial hardship pursuant to U.S.S.G. §2B1.1(b)(2)(B); a 2-level increase for vulnerable victims pursuant to U.S.S.G. §3A1.1(b)(1); and a 2-level increase for obstruction of justice pursuant to U.S.S.G. §3C1.1. The agreement also contemplated a 3-level reduction for acceptance of responsibility pursuant to U.S.S.G. §3E1.1.

The parties further reserved the right to argue for a sentence outside the applicable range established by the Guidelines and the right to argue that specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are

appropriate. The government also agrees to not recommend a sentence above the low end of the applicable guideline range provided the offense level used by the Court to determine the range was 30 or higher.

Based on the above calculations, the plea agreement contemplates a total adjusted offense level of 30. Assuming a criminal history category of I as calculated by probation, the applicable guideline range contemplated in the plea is 97-121 months.

B. <u>The Presentence Investigation Report</u>

On May 13, 2024, United States Probation Officer Adnan Chaudhry filed a Presentence Investigation Report (PSR) in this matter. The PSR calculation of the adjusted offense level was 32. The difference in the calculation between the plea agreement and PSR is the addition of a 2-level increase in the PSR for a violation of a prior judicial or administrative order pursuant to U.S.S.G. §2B1.1(b)(9)(C). Based on a criminal history category I, the PSR calculates a Sentencing Guideline range of 121-151 months. In a letter filed concurrently with the PSR, Officer Chaudhry recommends a high guideline range sentence of 151 months.

C. <u>Defendant's Objections to PSR</u>

(1) Defendant objects to the loss amount calculation as applied in ¶43 of the PSR. The substance of this objection is described in more detail below.

(2) Defendant objects to the 4-level increase for causing substantial financial hardship to five or more victims pursuant to U.S.S.G. §2B1.1(b)(2)(B) as applied in ¶44 of the PSR. As is described in detail below, Defendant contends that once the various assets of the subject companies are properly identified and liquidated, sufficient proceeds will be available to fully compensate all victims for the losses they have incurred because of the Defendant's illegal conduct. Therefore, there are not five or more victims that have suffered substantial financial hardship.

(3) Defendant objects to the 2-level increase for a violation of a prior judicial or administrative order pursuant to U.S.S.G. §2B1.1(b)(9)(C) as applied in ¶47 of the PSR. The substance of this objection is described in more detail below.

6

(4) Defendant objects to Probation's failure to impose a 2-level reduction pursuant to the "zero-point offender" statute pursuant to U.S.G.G. §4C1.1 as described in ¶¶61-63 of the PSR. The PSR acknowledges that Defendant Barber does in fact have no criminal history points. However, the reduction is not imposed on the basis that Barber caused substantial financial hardship to at least five investors. Defendant disagrees. As described in more detail below, the PSR miscalculates the total loss amount. When properly calculated, sufficient evidence does not exist that Mr. Barber personally caused substantial financial hardship. According to Probation, absent the substantial financial hardship exclusion, the Defendant otherwise qualifies.

(5) Defendant objects to the total adjusted offense level of 32 as stated in ¶64 of the PSR.

(6) Defendant objects to his alleged ownership of a property located at 21163 Newport Coast Drive as described in ¶124(ii) of the PSR. Defendant asserts this is the address to a P.O. box and not a property which he owns.

(7) Defendant objects to his alleged ownership of the three properties located at 345 University Drive as described in ¶124(iv-vi) of the PSR. Defendant asserts that these all relate to single rental property owned by his ex-wife Melony Barber.

(8) Defendant objects to his alleged ownership of a 2013 Cadillac Escalade as described in ¶125(i) of the PSR. Defendant asserts this vehicle was sold in 2016. Defendant does not currently own this vehicle.

(9) Defendant objects to the alleged $7,000 - $15,000 value of a 2012 Jaguar XF as described in ¶125(ii) of the PSR. Defendant asserts that while this vehicle is currently registered to him, at the time of his arrest the car was inoperable and impounded. The vehicle has no value other than as scrap.

(10) Defendant objects to Probation's recommendation of a low-end fine of $35,000 as described in ¶126 of the PSR. Defendant failed to complete the assets and liabilities portion of the Personal Financial Statement due to the complexity of his current financial situation and desire not to mistakenly provide false information. The reality is that all of Defendant's significant financial assets have been seized by the government.

These seized assets are substantial, the liquidation of which is expected to significantly reimburse the losses to named victims in this case. However, they are not available to Mr. Barber for the payment of a fine. Mr. Barber has no ability to pay a fine in this matter.

D. <u>Minimum and Maximum Possible Sentence</u>

The maximum term of imprisonment for the two wire fraud counts is 20 years per count and a term of supervised release of not more than 3 years. The criminal contempt charge carries a maximum of life and not more than 5 years of supervised release. There is no mandatory minimum term of imprisonment. The maximum fine is $250,000 per count. Pursuant to U.S.S.G. §5E1.2(c)(3) the fine range for this offense is $35,000 to $75,000.

E. <u>Defendant's Financial Condition and Inability to Pay a Fine</u>

Defendant disagrees with the assessment in the PSR that has the present ability to pay an immediate fine in this case and requests no fine be imposed. As described previously herein, all of Defendant's substantial assets have been seized and presumedly will be utilized to pay victim restitution. As a result, Mr. Barber has no income or assets available to pay a fine in this matter.

## III.

## CALCULATION OF LOSS AMOUNT

Under Sentencing Guideline §2B1.1(b)(1), the base offense level for a crime involving fraud is increased by a number of levels depending on specific offense characteristics, including the value of the loss caused by the fraud. In determining the amount of the loss, the greater of the actual or intended loss applies. U.S.S.G. § 2B1.1 app. N. 3(A).

Defendant Barber acknowledges that on October 30, 2023, he entered into a plea agreement with the government which included a stipulated loss amount to investors of between 3.5 and 9.5 million dollars. However, in a situation where a plea agreement has stipulated to a particular loss amount the district court is not bound to adhere to the terms agreed upon in the stipulated factual basis at the plea hearing, the charged offense of conviction or the conviction. *See* U.S.S.G. § 6B1.4(d) ("The court is not bound by the stipulation, but may with the aid of the presentence report, determine the facts relevant to

sentencing."); *United States v. Mason,* 961 F.2d 1460, 1462 (9th Cir.1992) ("[T]he district court was free to reject the stipulation in light of the true facts set forth in the presentence report."); *United States v. Szetela*, 345 Fed.Appx. 267 (9th Cir. 2009). (Following guilty plea for embezzlement the district court was not bound to adhere to terms agreed upon in stipulated factual basis at plea hearing in setting restitution amount).

Here, even before changing his plea Mr. Barber began asserting his belief that this loss amount was miscalculated. This belief caused Mr. Barber to back out of the first change of plea hearing and request the withdrawal of his plea the day after his plea agreement was accepted. This issue was the subject of a prior plea withdrawal motion, which Defendant is not going to relitigate here. However, while Mr. Barber continued to assert his belief the stipulated loss amount was incorrect through his efforts to withdraw his plea, attorneys and experts in the associated civil matter continued to work on these loss amount calculations. For both BNZ and NAC, these experts calculated all cash held and seized by the government, added the value of all notes and accounts receivables owed to both companies and added the estimated value of all property currently held by the government belonging to BNZ. After calculating the value of these assets, these experts compared these numbers to all outstanding monies owed to the various victims of both schemes. What they found was that enough assets exist, once fully liquidated by the government, to fully compensate all victims for the money currently owed.

These offset and credit calculations adhere to the guidelines, wherein credits against loss shall include money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. Further, in a case involving collateral pledged or otherwise provided by the defendant, loss amount shall be offset by the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.  U.S.S.G. §2B1.1, comment. (n.3(E)(i-ii)); see also *United States v. Cavallo*, 790 F.3d.1202, 1232-40 (11th Cir. 2015).

In support of the imposition of these various offsets and credits in calculating loss amount, Defendant submitted a spreadsheet to Probation detailing the various seized assets and accounts receivable attributable to the two relevant business entities. Probation notated this submission at footnote 1 on page 18 of the PSR. However, Probation failed to attach copies of the submitted documents with the report, instead electing to only provide a victim list with associated restitution amounts submitted by the government. The probation with Probation's submission is that the list provides only the gross amount of all investments made by each individual victim. It does not account for payments already made to these investors, which should be used to offset the total amount of restitution owed. As a result, there are certain investors on the list who are not owed anything, while many others are owed far less than the document submitted by Probation indicates.

Based on the expert calculations that the current assets and credits attributable to the subject business entities, Defendant submits that for purposes of the guideline calculations there is no present loss amount to the named victims. Therefore, Defendant's position is that no offense level increase should be imposed pursuant to U.S.S.G. §2B1.1(b)(1). Defendant expects the government's sentencing position to present its own rendition as to the value of the assets owned and seized from the subject entities. To the extent the government's version deviates from the numbers provided herein, Defendant requests a hearing for the Court to examine these differences and render a decision on any factual disputes.

## IV.

## A TWO LEVEL INCRERASE FOR A VIOLATION OF A PRIOR JUDICIAL OR ADMINISTRATIVE ORDER DOES NOT APPLY

U.S.S.G. §2B1.1(b)(9)(C) provides for a 2-level increase in the guidelines when the offense involves, "a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines." Application Note 8(C) further clarifies that, "Subsection (b)(9)(C) provides an enhancement if the defendant commits a fraud in contravention of a prior, official judicial or administrative warning, in the form of an order, injunction, decree, or process, to take or not to take a specified action.

1  A defendant who does not comply with such a prior, official judicial or administrative
2  warning demonstrates aggravated criminal intent and deserves additional punishment."
3      Here, Defendant admits as part of the plea agreement that he was previously barred
4  by the Financial Industry Regulatory Authority ("FINRA") from acting as or associating
5  with a broker-dealer. The question, however, is not the existence of the FINRA prohibition,
6  but instead whether Mr. Barber's activities in selling investment interests in BAC and
7  NAC, companies that he himself partially owned and managed, "contravenes" this
8  prohibition. According to the U.S. Securities and Exchange Commission ("SEC"), the
9  answer is no.
10     The SEC Office of the Advocate for Small Business Capital Formation explicitly
11 addresses the question of whether a company selling its own securities is acting as a
12 broker-dealer as follows:

> "A company issuing its own securities, sometimes called an issuer, generally is not acting as a broker because it is selling securities for its own account and not for the account of others. An issuer generally is not considered a dealer because it does not buy and sell its securities for its own account as part of its regular business."[2]

Mr. Barber is not accused of selling ownership interests in outside companies or businesses. The only financial interests he is accused of selling are in two companies that he owned, managed and controlled along with a business partner. As such, he was acting as an issuer, not as a broker or dealer. Therefore, his conduct is not covered by FINRA, and does not contravene any of its regulations or prohibitions. Rendering §2B1.1(b)(9)(C) inapplicable.

     Notably, the PSR fails to address the question of whether the Defendant's conduct in this case constitutes the activities of a broker-dealer. Rather, Probation notates the

---

[2] See oasb-broker-dealer-building-block.pdf (sec.gov)

agreed upon FINRA prohibition, and then assumes the prohibition has been violated. There is no analysis of what type of conduct FINRA regulates and whether Mr. Barber activities in this case fall under the auspices FINRA's regulations. Therefore, to the extent Defendant asserts that his conduct in this case is not that of a broker-dealer as defined by the SEC, this assertion is uncontroverted by Probation or the plea agreement.

## V.

## DEFENSE SENTENCING RECOMMENDATION

Given Mr. Barber's position relating to loss amount as discussed previously herein, Defendant believes a time served sentence is appropriate. Defendant agrees to a base offense level of 7. Defendant also agrees with an additional 2-level increase for at least 5 vulnerable victims and an additional 2-level increase for willfully disobeying a court order. Defendant further requests a 2-level reduction for acceptance or responsibility and another 2-level reduction for being a qualifying zero-point offender. This results in a final adjusted offense level of 7. With an agreed upon criminal history category I, the resulting guideline range is 0-6 months. Mr. Barber has already served over 13 months in custody.

The requested sentence is based on the factors cited in this memorandum, including Defendant's position on the lack of financial loss to the named victims, Defendant's lack of any prior criminal history and his longstanding struggles with substance abuse and mental health issues which substantially contributed to the commission of the charged offenses. Furthermore, with the adoption of Defendant's substantive objections to the PSR, the requested sentence falls at or above revised guideline range.

## VI.

## SENTENCING CONSIDERATIONS UNDER 18 U.S.C. § 3553(A)

A. <u>General Sentencing Principles</u>

In light of *United States v. Booker*, 125 U.S. 738 (2005), the sentencing guidelines are advisory and are but one factor to be considered by the Court in fashioning an appropriate sentence, to wit, a sentence that is "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. Section 3553(a).

The Sentencing Guidelines are only a starting point for the Court in crafting a reasonable sentence. Indeed, under Section 3553(a), the district courts are required to sentence below the range if such a sentence would be sufficient to achieve the purposes of sentencing. As a result, the sentencing guideline range is no longer binding on the Court, as the Sentencing Guidelines are merely advisory today and only one of several factors to be considered in determining sentence. *Booker*, 124 S.Ct. at 764-65. 18 U.S.C. Sections 3553(a) (1)-(7) provide the Court with other factors to include in the fashioning of a reasonable sentence:

1. the nature and circumstances of the offense and the history and characteristics of the defendant;
2. the need for the sentence imposed –
   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B) to afford adequate deterrence to criminal conduct;
   (C) to protect the public from further crimes of the defendant; and
   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
3. the kinds of sentences available;
4. the kinds of sentence and the sentencing range established for--
   (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, and that are in effect on the date the defendant is sentenced (***the Sentencing Guideline Range***);
5. any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. Section 994(a)(2) that is in effect on the date that defendant is sentenced;
6. the need to avoid unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct; and
7. the need to provide restitution to victim(s) of the offense.

*Id., 18 U.S.C. Sections 3553(a) (1)-(7)*.

Although the Sentencing Guidelines provide a starting point for the Court's

sentencing analysis, the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States,* 552 U.S. 38, 50 (2007). The Court's ultimate duty is to ensure that the sentence imposed reflects the principles set forth in 18 U.S.C. §3553 (a). *See Nelson v. United States,* 555 U.S. 350, 351 (2009). The "overarching provision" of §3553 (a) is "to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the sentencing goals advanced in §3553 (a) (2)." *Kimbrough v. United States,* 552 U.S. 85, 111 (2007). What is more, "the punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quoting *Williams v. New York*, 377 U.S. 241, 247 (1949).)

B. <u>Remorse and Acceptance of Responsibility</u>

Mr. Barber accepts full responsibility for misleading and withholding information to investors, as well as committing criminal contempt by failing to surrender as ordered by this Court. When Mr. Barber committed these crimes, he was suffering from a relapse of his long-standing drug and alcohol addictions. Drugs and alcohol contributed to his poor judgment and caused him to behave recklessly. Furthermore, at the time of the Court Order for Mr. Barber to surrender into custody, his father, who has since passed away, was extremely sick. Mr. Barber was his sole caregiver and understood that by surrendering he would likely never see his father again. Nevertheless, he realizes this decision was unjustifiable and sincerely apologizes to the Court for this terrible decision.

These contributing factors are not excuses. Mr. Barber accepts full responsibility for the decisions that caused his arrest and detention. Mr. Barber will make a further statement to the Court at the time of sentencing.

C. <u>Seriousness of the Offense</u>

The Defendant recognizes that wire fraud and criminal contempt are serious crimes. Mr. Barber's ongoing dispute regarding loss amount does not diminish the serious nature of misleading investors and disobeying a direct order from the Court. That being said, the relative seriousness of a wire fraud violation is at least in part measured by the loss amount caused to its victims. Here, Mr. Barber continues to assert that the seriousness of the wire fraud convictions is mitigated by the lack of substantial financial loss. Mr. Barber contends

that once the full liquidation of company assets is completed, the victims in this case will be fully reimbursed of all outstanding investment contributions. Mr. Barber looks forward to the opportunity to work with the government to identify and liquidate all outstanding company assets, so all victims are made whole.

D. <u>Respect for the Law and Deterrence</u>

Mr. Barber is 45 years old and prior to the indictment in this case, had never been charged or convicted of any crime. He graduated from Vanguard University with a B.S. in accounting and finance and went on to obtain multiple professional licenses in real estate, financial planning, and securities. Through the course of his adult life, Mr. Barber acted lawfully in assisting clients with their financial planning needs. Many of the victims in this case have a long successful professional history working with Mr. Barber.

It was only when faced with the unprecedented challenges brought on by covid-19 pandemic, along with a resurgence of his long-standing struggles with drugs and alcohol, that Mr. Barber engaged in a series of terrible decisions that caused his life to spiral out of control. Since his arrest, Mr. Barber has received treatment for his depression and participated in the medication assisted drug treatment program in custody. He is once again clean and sober and understands that he will suffer the effects of these poor decisions for the rest of his life. Regardless of what happens at sentencing, Mr. Barber's chosen career in the financial industry is over. He will need to start over professionally and rebuild personal trust with his friends and family. Facing this long road ahead, Mr. Barber is sufficiently deterred from ever making these types of decisions again.

E. <u>Sufficiency of the Proposed Sentence</u>

As stated previously, Mr. Barber has no prior criminal record and had never been arrested or detained prior to his arrest in this case. He has now served more than 13 months of actual custody. This custodial time, along with the tremendous impact this plea and sentence will have on him personally and professionally is sufficient to satisfy the goals of sentencing.

F. Disparity in Sentencing Among Similarly Situated Defendants

The proposed sentence should not create a disparity among other defendants who are similarly situated. According to the United States Sentencing Commission 2022 datafiles, only 76.2% of theft, property destruction, and fraud offenders were sentenced to prison. Of the theft, property destruction, and fraud offenders sentenced under the Guidelines Manual, 41.8% received a variance; of those offenders 93.1% received a downward variance with an average sentence reduction of 57.7%.[3]

Whether the Defendant's requested sentence of time served deviates from similarly situated defendants will largely depend on whether the Court adopts the loss amount articulated in the plea agreement. However, what these numbers demonstrate is that a prison sentence is these types of crimes is not a forgone conclusion and variances below the suggested Guideline Range are imposed nearly half the time.

G. Protection of the Public

Mr. Barber has no prior criminal convictions and the charges in this indictment are non-violent. Furthermore, as a result of the convictions in this matter, Mr. Barber will be permanently barred from any future employment in the financial sector. Therefore, he will no longer be in a position to commit a similar offense. As a result, there are no issues regarding protection of the public that warrant a higher sentence than what has been proposed by the Defendant.

## VII.
## CONCLUSION

After full analysis of the sentencing factors in this case, the information provided by the defense and probation, the Defendant requests that the Court impose the following sentence and make the following recommendations:

1. Time served;
2. 3 years supervised release; and

---

[3] See Theft_Property_Destruction_Fraud_FY22.pdf (ussc.gov) a true and correct copy of which is attached hereto as Exhibit "B."

        3. Imposition of no fine.

Dated: June 3, 2024                      Respectfully submitted,

                                       /s/ Jeremy Lessem
                                      JEREMY LESSEM
                                      Attorney for Brett Barber

# DECLARATION OF JEREMY I. LESSEM

I, Jeremy I. Lessem, declare as follows:

1. I am a member of the federal indigent panel. In such capacity, I was appointed to represent Brett Barber.

2. Attached hereto as Exhibit "A" is a true and correct copy of a spreadsheet setting forth the assets and liabilities of the subject entities as well as the outstanding financial obligations to all named victims in this case from the perspective of the Defendant. These documents were provided to me via email by attorney Alan M. Lurya. It is my information and belief that Mr. Lurya is involved in representing the Defendant in a closely related civil matter and obtained these calculations in the course and scope of his work with various experts in that case.

3. Attached hereto as Exhibit "B" is a true and correct copy of a United States Sentencing Commission "Quick Facts" statistical summary on theft, property destruction and fraud offenses for the fiscal year 2022. This document was obtained by me, online from the United States Sentencing Commission official website. [www.ussc.gov]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on June 3, 2024.

DATED: June 3, 2024                    /s/ Jeremy I. Lessem
                                       _____
                                       JEREMY I. LESSEM, Declarant